**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

JULIAN MONTOYA,

        Plaintiff,

        v.                                       Civ. No. 25-530 GJF/JMR

BOARD OF COUNTY COMMISSIONERS
FOR CIBOLA COUNTY, *et al.*,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Plaintiff's Motion to Remand, filed July 22, 2025. Dkt. No. 13. The Motion is fully briefed. *See* Dk. No. 16 (response); Dkt. No. 20 (reply). As explained herein, the Court lacks federal officer removal jurisdiction over this case under 28 U.S.C. § 1442(a)(1). Accordingly, the Court **GRANTS** Plaintiff's Motion and **REMANDS** this case to the Thirteenth Judicial District Court, Cibola County, New Mexico for lack of subject matter jurisdiction.

## I.    <u>BACKGROUND</u>

This case arises from a May 27, 2024 incident at Cibola County Correctional Center ("CCCC"), a detention facility owned and operated by CoreCivic. Plaintiff, a federal detainee housed at CCCC pursuant to a contract between Cibola County and the U.S. Marshals Service ("USMS"), alleges that an unqualified corrections officer left unlocked the cell door of two other inmates in Plaintiff's pod (the "attackers") or, alternatively, that someone from CCCC's administrative office remotely unlocked the cell that housed the attackers. Dkt. No. 1-1 ¶¶ 43–44. Plaintiff contends that the attackers, armed with homemade weapons and wearing homemade body

armor, escaped from their cell and attacked and subdued the unqualified corrections officer. *Id*. ¶¶ 45–46. According to Plaintiff, the attackers then used the officer's keys to unlock Plaintiff's cell, where they attacked Plaintiff and his cellmate for nearly ten minutes before other corrections officers intervened. *Id*. ¶¶ 50–56. Plaintiff asserts state law claims for negligence and violations of the New Mexico Tort Claims Act, N.M.S.A. 1978 §§ 41-4-1–41-4-27, and the New Mexico Civic Rights Act, N.M.S.A. 1978 §§ 41-4A-1–41-4A-13, against the Board of County Commissioners for Cibola County ("the County") and various corporate entities that collectively make up the private CoreCivic defendants that operate CCCC ("CoreCivic"). *See* Dkt. No. 1-1.

In addition to the contracts appended to and incorporated into Plaintiff's Complaint (*see* Dkt. No. 11, Ex. 1–2), both sides have submitted extrinsic evidence in support of their positions on the jurisdictional question before the Court, including various contracts and publications. *See, e.g.*, Dkt. No. 13, Ex. 1 (Inmate Housing Agreement); Dkt. No. 13, Ex. 2 (Oct. 2016 Management Agreement); Dkt. No. 13, Ex. 3 (Oct. 2017 USMS IGA with Amendment); Dkt. No. 16, Ex. 1 (Oct. 2019 Modification of Oct. 2017 USMS IGA); Dkt. No. 20, Ex. 5 (2009 Contract between CoreCivic and DOJ for housing federal detainees at NEOCC); Dkt. No. 20, Ex. 6 (Complaint in *Lind v. Ne. Ohio Corr. Ctr.*, No. 4:21CV2165, 2022 WL 429453 (N.D. Ohio Jan. 7, 2022)); Dkt. No. 20, Ex. 7 (OIG's March 2023 "Review of Concerns Related to the USMS's Implementation of Executive Order 14006"); Dkt. No. 20, Ex. 8 (GAO's July 2024 Report identifying "Actions Needed to Better Identify and Address Detention Condition Concerns"). Neither side objects to evidence presented by the other side, and because the Court is faced with a factual challenge to subject matter jurisdiction, it may consider such extrinsic evidence to resolve the Motion before it. *See Graff v. Aberdeen Enters., II, Inc.*, 65 F.4th 500 (10th Cir. 2023) (reasoning that when the movant attacks the factual basis for subject matter jurisdiction, the court may consider evidence to

resolve the jurisdictional facts); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1087 & n.11 (6th Cir. 2010) (considering the defendant federal contractor's contracts with the FAA to determine applicability of § 1442(a)(1), explaining that "[w]hen a district court's subject matter jurisdiction is in question, it is empowered to review extra-complaint evidence and resolve factual disputes") (citation omitted).

Although the USMS assumes responsibility for prisoners charged with federal offenses, it does not own or operate its own detention facilities; instead, prisoners in USMS custody are detained in state, local, and private detention facilities as well as in Federal Bureau of Prison facilities. *See* https://www.usmarshals.gov/what-we-do/prisoners/operation [https://perma.cc/VQ P2-VDHC] (last visited Mar. 12, 2026).[1] In the present case, Plaintiff was detained at CCCC pursuant to an Intergovernmental Agreement between the USMS and the County ("USMS IGA").[2] *See* Dkt. No. 13, Ex. 3. That USMS IGA was preceded by an October 28, 2016 Management Agreement between the County and CoreCivic.[3] *See* Dkt. No. 13, Ex. 2. According to the Management Agreement, the County "desire[d] [CoreCivic] to house federal inmates" at CCCC and provided that "[f]or every federal inmate accepted into custody [there], Core Civic [sic] shall

---

[1] The Court is permitted to take judicial notice of facts contained on government websites. *See* Fed. R. Evid. 201(b); *New Mexico ex rel. Richardson v. BLM*, 656 F.3d 683, 702 & n. 22 (10th Cir. 2009) (taking judicial notice of facts on government websites and observing, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

[2] Plaintiff submitted an October 19, 2017 IGA between the USMS and the County (Dkt. No. 13, Ex. 3), which both sides reference as the operative agreement at the time of the events giving rise to Plaintiff's claims. *See* Dkt. No. 13 at 3; Dkt. No. 16 at 1–2. In addition, Defendants submitted an excerpt from a September 27, 2019 modification of that IGA in which the USMS and the County agreed that USMS detainees would be housed and inspections permitted in accordance with the *Federal Performance Based Detention Standards*, rather than the Core Detention Standards referenced in the October 19, 2017 iteration of the IGA. *See* Dkt. No. 16, Ex. 1, at 2–3. The Court refers to the 2017 and 2019 IGAs collectively as "the USMS IGA."

[3] When it entered into the 2016 Management Agreement, CoreCivic operated under the name Corrections Corporation of America. *See* Dkt. No. 13, Ex. 2. The company has since rebranded as CoreCivic. *See* https://www.corecivic.com/news/corrections-corporation-of-america-rebrands-as-corecivic [https://perma.cc/S8VK-GJMS] (last visited Mar. 12, 2026).

provide services in compliance with the terms of the applicable [IGA], which shall be appended to and incorporated into [the Management] Agreement." *Id*. at 1. The Management Agreement also memorialized the County's intent to "enter into an Intergovernmental Service Agreement . . . with the United States Immigration and Customs Enforcement (ICE)" and provided that the County may also "enter other/additional [IGAs] for services to be provided at [CCCC], subject to [CoreCivic's] advance written approval." *Id*. The USMS IGA, which the County and the USMS entered into a year later, was one such "additional IGA" that, according to the Management Agreement's terms, was incorporated into the Management Agreement.

The USMS IGA authorized the USMS to house federal detainees with the County at CCCC. Dkt. No. 13, Ex. 3 at 3. Under the terms of the USMS IGA, the County agreed to "accept and provide for the secure custody, safekeeping, housing, subsistence and care of Federal detainees in accordance with all state and local laws, standards, regulations, policies, and court orders applicable to the operation of [CCCC]" and in a manner consistent with federal law and the Federal Performance Based Detention Standards (FPBDS) "and/or any other standards required by an authorized agency whose detainees are housed by [the County]." *Id*.; Dkt. No. 16, Ex. 1 at 3. FPBDS are standards "designed for use in reviewing non-federal facilities that house federal prisoners to ensure these facilities are safe, humane, and protect prisoners['] statutory and constitutional rights." *See* https://www.usmarshals.gov/what-we-do/prisoners/operation/custody-detention/federal-performance-based-detention-standards [https://perma.cc/QCE5-LHAF] (last visited March 12, 2026).

The USMS IGA specified that the "Federal Government shall have access to the Facility and to the Federal detainees housed there, and to all records" related to the USMS IGA. Dkt. No. 13, Ex. 3 at 3. Relatedly, the County agreed to permit "periodic inspections by Federal Government

inspectors, to include approved Federal contractors, in accordance with the [FPBDS] required by all of the Federal authorized agency users whose detainees may be housed pursuant to the [USMS IGA]." Dkt. No. 13, Ex. 3 at 12; Dkt. No. 16, Ex. 1 at 2. In terms of medical services, the USMS IGA obligated the County to "provide Federal detainees with the same level and range of care inside [CCCC] as that provided to state and local detainees." Dkt. No. 13, Ex. 3, at 4; Dkt. No. 16, Ex. 1 at 2–3. In addition, the IGA provided that medical care for federal detainees was to be provided "in accordance with the provisions of USMS, Publication 100-Prisoner Health Care Standards . . . and in compliance with the [FPBDS] or those standards which may be required by any other authorized agency user." Dkt. No. 13, Ex. 3, at 5; Dkt. No. 13, Ex. 1, at 2–3. The IGA required the County to "notify the Federal Government of any activity by a Federal detainee which would likely result in litigation or alleged criminal activity," to include escape, attempted escape, assault, death, or a medical emergency. Dkt. No. 13, Ex. 3 at 8. In exchange for the County's agreement to house USMS detainees at CCCC, the USMS agreed to pay the County at a specified per diem rate for each federal detainee. *Id*. at 10–11.

In an Amendment to the October 19, 2017 USMS IGA, entered the same day, the USMS and the County further agreed "that overall management and operation of the housing of the Federal Detainees subject to this Agreement is contracted by the County to Core Civic [sic] under the County's agreement with Core Civic [sic]." *Id*. at 16. CoreCivic was not identified as a party to, and did not sign, the IGA Amendment, which provided that "[t]he [USMS] hereby grants its consent to the contracting" between the County and CoreCivic. *Id*. The Amendment described the County as a "passthrough entity, with its contract with Core Civic [sic]." *Id*. at 15.

On the basis of the pass-through arrangement consisting of the Management Agreement, the USMS IGA, and its Amendment, Defendants filed their Notice of Removal (Dkt. No. 1) on

5

June 4, 2025, alleging that CoreCivic Defendants are eligible for removal under 28 U.S.C. § 1442(a)(1), the federal officer removal statute.[4] Dkt. No. 1 ¶ 8, 9, 33. In support, Defendants rely on *Lind v. Northeast Ohio Correctional Center*, No. 4:21CV2165, 2022 WL 429453, at *2 (N.D. Ohio Jan. 7, 2022). *Id*. ¶ 33. There, the court determined that CoreCivic, which operated Northeast Ohio Correctional Center ("NEOCC") – where the USMS-detainee plaintiff was housed – properly invoked § 1442(a)(1) to remove that case to federal court. *Lind*, 2022 WL 429453, at *1–2.

For his part, Plaintiff insists that removal under § 1442(a)(1) is improper. Among other things, he points to a publication by the Department of Justice's ("DOJ's") Office of the Inspector General ("OIJ"), which was released a year after *Lind* was decided. *See* Dkt. No. 20, Ex. 7.[5] That publication, entitled "Review of Concerns Raised Related to the [USMS's] Implementation of Executive Order 14006," discussed the USMS's use of NEOCC in light of a 2021 Executive Order issued by then-President Biden which sought to phase out reliance on privately-operated prisons. *See* Dkt. No. 20, Ex. 7. Before it was revoked by President Trump in 2025, Executive Order 14006 prohibited the DOJ from renewing contracts with private facilities. Executive Order 14006, 86 FR 7483, 2021 WL 289533 (Jan. 26, 2021), *revoked by* Executive Order 14148, 90 FR 8237, 2025 WL 305765 (Jan. 20, 2025). The OIJ's March 2023 publication observed that, in response to Executive Order 14006, the USMS replaced its expiring *direct* contract with CoreCivic to house federal detainees at NEOCC with a pass-through IGA with a local government entity (Mahoning County) that in turn contracted with CoreCivic to continue using NEOCC for USMS detainees.

---

[4] Defendants assert that because the Court has federal officer jurisdiction over claims against CoreCivic, it has supplemental jurisdiction over Plaintiff's remaining claims. Dkt. No. 1 ¶ 34 (citing 28 U.S.C. § 1367(a)).

[5] The OIJ's publication, provided to the Court as Exhibit 7 to Plaintiff's reply, is also available on the OIG's website. *See* https://oig.justice.gov/reports/review-concerns-raised-related-united-states-marshals-services-implementation-executive [https://perma.cc/B4HK-UWM6] (last visited Mar. 12, 2026).

Dkt. No. 20, Ex. 7 at 2.  As the OIG described it, the restructure of the NEOCC contract as a pass-through IGA meant that "USMS was no longer contracting with a private entity[, as] the IGA inserted a third party between the USMS and the contractor." *Id*. at 3. The OIG outlined drawbacks of this pass-through IGA structure for housing federal detainees:

> The IGA . . . decreased the USMS's control over [NEOCC's] conditions of confinement. The USMS's Prisoner Operations Division has the ability to exercise considerable influence and control over the management of its private contract detention facilities. However, under IGAs, the state or local government manages the services provided and the day-to-day conditions of confinement consistent with applicable laws and regulations. IGA facility agreements neither grant the USMS authority to manage the operations or policies of the facility, nor impose consequences if the USMS's requests and recommendations are not implemented.

*Id*. at 5. The OIG further observed that "specific contractual penalties for noncompliance that were present in the [pre-Executive Order, *direct*] contract arrangement were eliminated in the IGA" and that "[t]he only remedy for noncompliance [was] for the USMS to reduce or cease its use of the NEOCC." *Id*. The OIG concluded that the USMS's IGA "compromise[d] USMS control over detainee handling."[6] *Id*. at 6.

Plaintiff notes that the U.S. Government Accountability Office ("GAO") has likewise criticized the reduced oversight and supervision by the USMS over private facilities subject to pass-through IGAs. Dkt. No. 20 at 8. In its July 2024 Report to Congress entitled "U.S. Marshals Serve: Actions Needed to Better Identify and Address Detention Condition Concerns,"[7] the GAO opined that USMS policies governing pass-through IGA facilities omit "key elements" and involve

---

[6] The OIG also had other criticisms of the pass-through IGA, to include a significant cost increase for the USMS. *See* Dkt. No. 20, Ex. 7 at 5.

[7] The GAO's publication, provided to the Court as Exhibit 8 to Plaintiff's reply, is also available on the GAO's website. *See* https://www.gao.gov/products/gao-24-106348 [https://perma.cc/CX86-4XM9] (last visited Mar. 12, 2026).

less comprehensive audits and inspections as compared to those of private facilities with which the USMS contracts directly. *See* Dkt. No. 20, Ex. 8, at 8 n. 23, 11–12.

## II.      APPLICABLE LAW

A party removing a case to federal court must "affirmatively establish" that federal jurisdiction exists. *McPhail v. Deere & Co.*, 529 F.3d 947, 955–56 (10th Cir. 2008). "Because the jurisdiction of federal courts is limited, there is a presumption against [federal court] jurisdiction, and the party invoking federal jurisdiction bears the burden of proof." *Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005) (internal quotation omitted).

Federal courts have subject-matter jurisdiction over claims that are properly removed under 28 U.S.C. § 1442(a)(1), the federal officer removal statute. *See Mesa v. California*, 489 U.S. 121, 136 (1989). That statute permits removal of a state court civil action "that is against or directed to . . . any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "The statute's 'basic purpose' is to protect against the interference with federal operations that would ensue if a state were able to arrest federal officers and agents acting within the scope of their authority and bring them to trial in a state court for an alleged state-law offense." *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022) (citation omitted) (discussing the purpose of § 1442(a)(1) in the context of private energy companies' removal of a civil case). Unlike other removal statutes, the federal officer removal statute should "be *liberally construed* to give full effect to [its] purpose."[8] *Colorado v. Symes*, 286

---

[8] Removal statutes other than § 1442(a)(1) "are to be strictly construed, and all doubts are to be resolved against removal." *Fajen v. Found. Rsrv. Ins. Co., Inc.*, 683 F.2d 331, 333 (10th Cir. 1982) (citations omitted).

U.S. 510, 517 (1932) (emphasis added). Also unlike other removal statutes, an order remanding a case removed pursuant to the federal officer removal statute is appealable. *See* 28 U.S.C. § 1447(d).

Private defendants may assert federal officer jurisdiction under § 1442(a)(1) "if they can show (1) they acted under the direction of a federal officer, (2) the claim has a connection or association with the government-directed conduct, and (3) they have a colorable federal defense to the claim or claims." *Suncor Energy*, 25 F.4th at 1251. A removing private defendant retains the burden of establishing jurisdiction under § 1442(a)(1) by a preponderance of the evidence. *Id.* at 1250.

## III.    DISCUSSION

### A.  The Parties' Arguments

In his Motion to Remand, Plaintiff contends that CoreCivic's actions do not fall within the purview of the federal officer removal statute because CoreCivic was not contractually bound to the USMS. Dkt. No. 13 at 3. In Plaintiff's view, three contracts are relevant to the Court's § 1442(a)(1) inquiry: (1) the July 2021 Inmate Housing Agreement between the County and CoreCivic[9] (Dkt. No. 20, Ex. 1); (2) the October 2016 Management Agreement between the County and CoreCivic (Dkt. No. 20, Ex. 2); and (3) the October 2017 IGSA between the County and the USMS (the "USMS IGSA") (Dkt. No. 20, Ex. 3). Dkt. No. 13 at 3. Plaintiff emphasizes that *none* of these contracts were between CoreCivic and the USMS. *Id*. It follows, he suggests, that CoreCivic is not a federal contractor in the context of this case. *Id*. at 9. Taking the position that "federal contractor status [i]s a baseline requirement" for a private company to remove a case pursuant to § 1442(a)(1), Plaintiff maintains that CoreCivic cannot establish federal officer

---

[9] The Inmate Housing Agreement, on its face, relates to *County detainees*, not federal detainees, and its relevance to the present inquiry before the Court is therefore unclear.

9

removal jurisdiction here in the absence of a contract with the USMS. *Id*. at 5–6. Relatedly, Plaintiff contends that the USMS does not control or direct CoreCivic's activities at CCCC to the extent that CoreCivic could be said to be "acting under" the USMS. *Id*. at 7; Dkt. No. 20 at 5.

For their part, Defendants argue that neither § 1442(a)(1) nor binding precedent require a *direct* contractual relationship for a private entity to avail itself of the statute's forum protections. Dkt. No. 16 at 3–4. In addition, Defendants contend that both CoreCivic and the County *are* federal contractors for purposes of § 1442(a)(1) by virtue of the Management Agreement's incorporation of the USMS IGA and its Amendment. *Id*. at 6.  Defendants insist that despite the indirect, pass-through IGA arrangement under which CCCC is operated, the USMS still maintains "operational oversight and control over the care and management of [USMS] detainees" held at CCCC, as the IGA mandates "compliance with a comprehensive set of detention standards." *Id*. at 5. Moreover, by assisting the USMS in carrying out its duty to provide for the safe and secure confinement of USMS detainees, Defendants insist that CoreCivic is "acting under" the USMS in providing a service the USMS would otherwise have to provide. *Id*. at 11–12.

### B.    Analysis

Under Tenth Circuit law, private defendants like CoreCivic may assert federal officer jurisdiction under 28 U.S.C. § 1442(a)(1) "if they can show (1) they acted under the direction of a federal officer, (2) the claim has a connection or association with the government-directed conduct, and (3) they have a colorable federal defense to the claim or claims." *Suncor Energy*, 25 F.4th at 1251. Conceding that CoreCivic can likely satisfy the second and third prongs, Plaintiff insists it cannot demonstrate the first. Dkt. No. 20 at 1. Thus, for present purposes, removability pursuant to § 1442(a)(1) turns on whether CoreCivic "acted under the direction of" the USMS.

The Tenth Circuit addressed application of the "acting under" prong to private companies at some length in *Suncor Energy*. To begin, it noted that "[t]he statutory phrase 'acting under' describes 'the triggering relationship between a private entity and a federal officer'" for purposes of § 1442(a)(1). *Suncor*, 25 F.4th at 1251 (citation omitted). Describing "acting under" as "broad but 'not limitless[,]'" the Tenth Circuit explained:

> In this context, "under" describes a relationship between private entity and federal superior typically involving "subjection, guidance, or control." Thus, a "private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." This "help or assistance necessary to bring a private person within the scope of the statute does not include simply complying with the law [ ] . . . even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." Rather, "there must exist a 'special relationship' between" the private firm and the federal superior."

*Id.* (internal citations omitted). To flesh out the requisite "special relationship," the Tenth Circuit drew upon the United States Supreme Court's analysis in *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007), observing that the Court there "unanimously rejected [a private company's] attempt to equate the sufficiency of 'close supervision' over private contractors to 'intense regulation' of firms who are not operating under a governmental contract." *Suncor Energy,* 25 F.4th at 1252 (citing *Watson*, 551 U.S. at 153). The Tenth Circuit emphasized that, to satisfy the "acting under" prong, the assistance provided by the private entity must go "beyond simple compliance with the law" and must assist the federal officer in "fulfill[ing] other basic governmental tasks." *Id*. (citing *Watson*, 551 U.S. at 153).

To illustrate the types of contracts between federal superiors and private companies that constitute "sufficient special relationship[s]" for § 1442(a)(1) removal, the Tenth Circuit (and the Supreme Court before it) pointed to, as the paradigmatic example, the wartime defense contract between Dow Chemical and the Department of Defense ("DOD") for the production of Agent

11

Orange for use during the Vietnam War. *Suncor Energy*, 25 F.4th at 1252 (discussing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998), *overruled on other grounds by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020)); *Watson*, 551 U.S. at 153–54 (citing *Winters*, 149 F.3d at 387). Significantly, in *Winters*, the DOD gave Dow Chemical detailed specifications as to the make-up, packaging, and delivery of Agent Orange and maintained ongoing supervision over its production and delivery. *Winters*, 149 F.3d at 400. And as the Supreme Court observed in *Watson*, by producing Agent Orange, Dow Chemical "performed a job that, in the absence of a contract with a private firm, the [g]overnment itself would have had to perform." *Watson*, 551 U.S. at 154.

In light of the Supreme Court's analysis in *Watson*, and given its reliance on *Winters*, the Tenth Circuit reasoned in *Suncor Energy* that a private company has a sufficiently special relationship with a federal agency for purposes of § 1442(a)(1) if it:

> go[es] beyond mere compliance with contractual terms, even if complex, and agree[s] to help carry out the duties or tasks of the federal superior under that superior's strict guidance or control. And this closely supervised work must help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, it must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract.[10]

*Suncor Energy*, 25 F.4th at 1253. In contrast to the DOD contract in *Winters*, the Tenth Circuit determined that the removing private energy companies in *Suncor Energy* did *not* establish federal officer removal jurisdiction. The companies' federal contracts, which were leases administered by the Department of Interior ("DOI"), permitted extraction of fossil fuels from the country's outer continental shelf but did not obligate the energy company private lessees "to tailor their fuel

---

[10] Alternatively, the Tenth Circuit indicated that "the 'acted under' element may be established through the explicit contractual delegation of legal authority to act on the federal superior's behalf." *Suncor Energy,* 25 F.4th at 1253.

production to detailed government specifications aimed at satisfying pressing federal needs." *Id*. Moreover, because the DOI did not control the manner in which the energy companies drilled for oil or gas, nor direct how much fossil fuel they could sell, the leases did not constitute the type of "close supervision" necessary to bring the energy companies within the meaning of § 1442(a)(1). *Id*. at 1253. Notably, the Tenth Circuit reached this conclusion despite the leases' requirement that the energy companies drill in accordance with "federally approved exploration, development, and production plans and conditions" and even though DOI officials reserved the right to obtain "prompt access" to the private lessees' facilities and records. *See id.* at 1247–48.

In the same vein, the Supreme Court determined in *Watson* that private cigarette-manufacturing firms were not "acting under" the Federal Trade Commission ("FTC") when they tested and advertised the tar and nicotine levels in cigarettes in compliance with detailed regulations from the FTC. *Watson*, 551 U.S. at 151–54.  The Court emphasized that the federal assistance necessary to bring a private company within the scope of § 1442(a)(1) requires more than mere compliance with or acquiescence to the law. *Id*. at 151–52. As the Supreme Court put it, "[a] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Id*. at 153.

From the analyses in *Suncor Energy* and *Watson*, Plaintiff derives a "baseline requirement" of "federal contractor status" for application of § 1442(a)(1). Dkt. No. 13 at 5. Indeed, he contends that the "seminal cases" cited by the parties, including *Suncor Energy*, specifically analyze the details of a given government contract, and the parties' performance thereunder, because such a contract is how the federal agency exerts control over the private entity. Dkt. No. 20 at 2. In response, Defendants advance two related arguments: (1) that § 1442(a)(1) does not require a

*direct* contractual relationship between the private entity and the federal agency; and (2) that both CoreCivic and the County *are* federal contractors by virtue of the USMS IGA Amendment and the Management Agreement. Dkt. No. 16 at 6.

As to Defendants' first argument, the Court agrees that neither § 1442(a)(1) nor binding precedent have *explicitly* required a *direct* contractual relationship between the federal agency or official and the person or entity "acting under" that federal agency or official. But the reverse is also true. That is, the parties have not pointed to any binding authority expressly holding that a direct contractual relationship is *not* a prerequisite to application of § 1442(a)(1). With the exception of *Watson*, each of the cases referenced by the parties involved *direct* contracts by federal agencies and the private companies attempting to establish federal officer removal jurisdiction. *See, e.g., Suncor Energy*, 25 F.4th at 1253–54 (analyzing private energy companies' leases with the DOI); *Winters*, 149 F.3d at 387 (discussing a chemical company's contract with the DOD); *Bennett*, 607 F.3d at 1082 (considering mold remediation firms' contracts with the FAA). And notably, the Supreme Court declined to authorize federal officer removal in *Watson*, where there was no contract in place between the private cigarette manufacturers and the FTC. *Watson*, 551 U.S. at 156 (reasoning that there was "no evidence of any delegation of legal authority from the FTC" to the cigarette manufacturers and no "evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement"); *see also Suncor Energy*, 25 F.4th at 1252 (gleaning from *Watson* that "intense regulation of firms *who are not operating under a governmental contract*" does not equate to sufficiently "close supervision" for the private firm to invoke § 1442(a)(1) (emphasis added)). At minimum, therefore, the existence of a contract between a federal agency and a private entity is an important factor in determining whether the private entity is "acting under" the federal agency for purposes of § 1442(a)(1). *See Suncor Energy*,

14

25 F.4th at 1252–53 (discussing the *types of contracts* that constitute a "sufficient special relationship" and emphasizing that such a special relationship "go[es] beyond mere compliance *with contractual terms*, even if complex") (emphasis added).

It appears that neither the Tenth Circuit nor the Supreme Court have had occasion to weigh in on § 1442(a)(1)'s application to an *indirect*, pass-through contractual relationship involving a federal agency and a private entity. And in this Court's view, the purposes of § 1442(a)(1) may be served by permitting federal officer removal even absent contractual formalities, so long as the federal agency exercises functional control over the private entity through some indirect contractual relationship. *See Symes*, 286 U.S. at 517 (reasoning that the federal officer removal statute should "be *liberally construed* to give full effect to [its] purpose" (emphasis added)). Given the Court's reluctance to exalt form over substance, the Court does not read *Watson* and *Suncor Energy* to necessarily and in all cases foreclose application of federal officer removal in the absence of a *direct* government contract. Instead, the Court examines the various agreements that culminated in Plaintiff's detention at CCCC to determine whether they collectively render CoreCivic the functional equivalent of federal contractors "acting under" the USMS in this context.

First, the October 2016 Management Agreement between the County and CoreCivic provided that, for federal inmates accepted into CCCC's custody, Core Civic was to provide detention services "in compliance with the terms of the applicable [IGA], which shall be appended to and *incorporated into* [the Management] Agreement." Dkt. No. 13, Ex. 2 at 1 (emphasis added). A year later, the County and the USMS entered into the USMS IGA as well as a same-day Amendment thereto. The USMS IGA authorized the USMS to house federal detainees at the CCCC. In exchange for payment at a specified per diem rate per federal detainee, *the County*

15

agreed to provide for the secure custody and care of federal detainees in accordance with state and local laws and in a manner consistent with federal law, the FPBDS and the USMS Publication 100-Prisoner Health Care Standards. The County also agreed to permit the federal government access to CCCC and to records pertaining to federal detainees housed therein. In the USMS IGA Amendment, the County and the USMS agreed that the "overall management and operation of the housing of the Federal Detainees" under the USMS IGA would be contracted by the County to CoreCivic under the County's separate agreement with CoreCivic. Dkt. No. 13, Ex. 3, at 16. The Amendment further provided that the USMS "consent[ed] to the contracting" between the County and CoreCivic, and it described the County as a "passthrough entity, with its contract with Core Civic [sic]." *Id*. at 15–16.

Plaintiff and Defendants agree that by using a pass-through IGA structure, whereby the USMS entered into an agreement with the County which, in turn, contracted with CoreCivic, the USMS bypassed the competitive bidding process that would have otherwise been necessary. *See* Dkt. No. 16 at 5; Dkt. No. 20 at 5–6. They disagree, however, as to § 1442(a)(1)'s applicability in light of the terms and interplay of the Management Agreement, USMS IGA, and USMS IGA Amendment. Plaintiff first maintains that because there is no singular contract whereby CoreCivic undertakes contractual obligations *to the USMS*, CoreCivic is therefore not "acting under" the USMS and cannot avail itself of § 1442(a)(1)'s forum protections. Second, although Plaintiff concedes that the detention services CoreCivic performs pursuant to its Management Agreement with the County are federally regulated, he insists that the USMS does not exert "*Watson* levels of direct control and oversight of CoreCivic's actions." Dkt. No. 13 at 9. Defendants, on the other hand, maintain that the Management Agreement's express incorporation of the USMS IGA transforms both the County and CoreCivic into federal contractors and compel the conclusion that

16

CoreCivic has been performing under the USMS IGA and "acting under" the USMS. Dkt. No. 16 at 6. Defendants further contend that the pass-through IGA implicates § 1442(a)(1) because (1) CoreCivic acts on behalf of the USMS by carrying out a federal task – the housing and care of federal detainees – for which the USMS would otherwise bear responsibility if not for the contracts entered into by the County, the USMS, and CoreCivic (Dkt. No. 16 at 11–12); and (2) the USMS maintains operational oversight and control over the care and management of USMS detainees at CCCC despite those detainees being held in a private facility operated by CoreCivic (Dkt. No. 20 at 5).

Putting aside for now whether a direct federal contract is a precondition to federal officer removal jurisdiction, the Court understands *Watson* and *Suncor Energy*, when read together, to at least clarify that § 1442(a)(1) removal requires a "special relationship" under which the federal superior delegates to the private entity one of its governmental tasks while retaining strict oversight over the performance of that task. *See Watson*, 551 U.S. at 152 (reasoning that a relationship where a private person is "acting under" a federal officer or agency for purposes of § 1442(a)(1) requires "subjection, guidance or control" and "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior") (citation omitted); *Suncor Energy*, 25 F.4th at 1253 (explaining that a private entity may only invoke § 1442(a)(1) if it "go[es] beyond mere compliance with contractual terms, even if complex, and agree[s] to help carry out the duties or tasks of the federal superior under that superior's strict guidance or control"). Here, to the extent Defendants contend that CoreCivic is performing a federal task that, in the absence of the pass-through IGA arrangement, the USMS would otherwise need to undertake, the Court agrees. To be sure, providing housing, sustenance, security, and medical care to federal detainees while they await various stages of their federal criminal proceedings are responsibilities that would otherwise be borne by the federal

government and specifically the USMS.  But whether the USMS maintains sufficient operational oversight and control over CoreCivic's care and management of USMS detainees at CCCC for CoreCivic to avail itself of § 1442(a)(1) is a much closer question.

To demonstrate that the USMS does *not* retain the "strict guidance or control" that § 1442(a)(1) requires, Plaintiff contrasts the facts of this case with the one on which Defendants rely in their Notice of Removal:  *Lind*, 2022 WL 429453. At first blush, *Lind* appears to be on all fours with the instant case, as the issue before the court there was whether CoreCivic, which operated a private detention facility in Ohio where the USMS-detainee plaintiff was housed, had properly invoked § 1442(a)(1). 2022 WL 429453 at *1–2. Indeed, Defendants represent in their response brief that "[l]ike CCCC, CoreCivic's Northeast Ohio Correctional Center ("NEOCC"), at issue in *Lind*, is subject to an Intergovernmental Pass-Through Agreement between USMS and Mahoning County and a Management Agreement between Mahoning County and CoreCivic." Dkt. No. 16 at 12 n.9. If that were true, *Lind* would constitute on-point persuasive authority supporting Defendants' removal under § 1442(a)(1) here. But as Plaintiff demonstrates in his reply brief, Defendants are mistaken about *Lind*.

Plaintiff supplies for the Court's consideration the contract governing detention services at the time of events giving rise to the claims at issue in *Lind*. *See* Dkt. No. 20, Ex. 5. Unlike the USMS IGA here, the *Lind* contract to house federal detainees at NEOCC was entered into *directly* between the DOJ and CoreCivic. *See id*. at 1. It was only *after* that direct governmental contract expired, and *after* the events giving rise to the claims in *Lind*, that the USMS pursued an indirect pass-through IGA with Mahoning County similar to the one it entered with the County here. *See* Dkt. No. 20, Exs. 6 & 7. Thus, in *Lind*, the Northern District of Ohio permitted CoreCivic to invoke federal officer removal jurisdiction in a different context: CoreCivic was defending claims by a

USMS detainee that arose while CoreCivic was party to a 120-page contract *directly* with the DOJ to house USMS detainees and which imposed on CoreCivic – not Mahoning County – various and sundry obligations to the DOJ in the performance of its detention services. *See* Dkt. No. 20, Ex. 5. Plaintiff insists that comparison of the *Lind* contract and the USMS IGA here reveals "*vast differences*" in the oversight the federal government retained and exercised with respect to CoreCivic's housing of USMS detainees. Dkt. No. 20 at 4. As Plaintiff sees it, the USMS IGA and Management Agreement at issue here subjected CoreCivic to only "diluted, indirect oversight, which, at best, is mediated through the County," whereas the *Lind* contract imposed on CoreCivic "detailed federal standards, inspection, reporting, and enforcement remedies." *Id*.

As between the USMS IGA at issue here and the *Lind* contract, the Court agrees that the latter contemplates substantially more direct government oversight than the former. Although the USMS IGA specified that federal detainees were to be held in accordance with state, local, and *federal* law, and in a manner consistent with the FPBDS, it is noteworthy that those general contractual obligations were owed to the federal government *by the County* and only *indirectly* (at most) by CoreCivic through the Management Agreement's incorporation of the USMS IGA. The *Lind* contract, in contrast, contemplated more robust and more direct federal oversight of CoreCivic's detention services, obligating CoreCivic to develop policies and procedures consistent with the American Correctional Association and FPBDS, which were to be reviewed and approved by the federal government. Dkt. No. 20, Ex. 5, at 11. The *Lind* contract also required CoreCivic to ensure specified guard qualifications and to comply the Performance-Based Detention Standards for Adult Local Detention Facilities, the National Commission on Correctional Health Care Standards for Health in Jails, and the Prison Rape Elimination Act. *See id*. at 7, 11, 12, 17, 23, 57, 86, 119.

19

With regard to inspection authority, the USMS IGA required only that the County permit "periodic inspections" by the federal government, allowing access to CCCC, to the federal detainees housed there, and to relevant records. Dkt. No. 13, Ex. 3 at 3. In contrast to the discretionary and generally-framed auditing authority contemplated by the USMS IGA, the *Lind* contract outlined a *comprehensive* yearly (or more frequent) auditing scheme. S*ee* Dkt. No. 20, Ex. 5 at 48–53. In terms of medical services, the County's obligations (and by extension those of CoreCivic) under the USMS IGA were, again, narrower. The USMS IGA obligated the County to afford federal detainees "the same level and range of care inside [CCCC] as that provided to state and local detainees" but to do so in accordance with the FPBDS and the USMS, Publication 100-Prisoner Health Care Standards. Dkt. No. 13, Ex. 3 at 4–5. But the *Lind* contract also required CoreCivic to implement policies and to satisfy detailed requirements for medical staffing, infectious disease protocols, and emergency response systems. *See, e.g.*, Dkt. No. 20, Ex. 5 at 38–39, 98–99, 108, 115. With respect to reporting and notification obligations, the USMS IGA required the County to notify the federal government of any activity by a federal detainee likely to result in litigation, criminal activity, or a medical emergency. *See* Dkt. No. 13, Ex. 3 at 8. The *Lind* contract went much further, requiring CoreCivic to report to the USMS/DOJ, within specified time periods, a wide variety of "incidents," grievances, and uses of force. *See, e.g.*, Dkt. No. 20, Ex. 5, at 16, 19, 24, 28, 31, 39. Perhaps most critically for purposes of § 1442(a)(1), the *Lind* contract incorporated enforcement mechanisms triggered by a failure of CoreCivic to satisfy its contractual obligations to the federal government (*e.g.*, withholding per diem, mandating corrective action plans, suspending detainee transfers, immediate termination). Dkt. No. 20, Ex. 5 at 6, 14, 47–48. The USMS IGA, on the other hand, omitted specific contractual penalties for non-compliance and only permitted termination of the IGA, by the County or the USMS, with thirty

(30) days' notice unless an emergency situation requiring immediate relocation of federal detainees arose. *See* Dkt. No. 13, Ex. 3 at 4.

Defendants are correct that the USMS IGA included provisions that required compliance with federal standards, including the FPBDS.  Nevertheless, the Court is not convinced that those obligations, particularly when owed directly to the federal government *only by the County*, constitute the type of federal oversight and supervision that § 1442(a)(1) requires. Significantly, the Tenth Circuit in *Suncor Energy* determined that the lessor-lessee relationship between the private energy companies and the DOI there did *not* constitute the type of "close supervision" necessary to satisfy § 1442(a)(1) even though leases required the energy companies to drill in accordance with "federally approved exploration, development, and production plans and conditions" and even though DOI officials reserved the right to obtain "prompt access" to the private lessees' facilities and records. *See id.* at 1247–48. As the Supreme Court emphasized in *Watson*, "the help or assistance necessary to bring a private person within the scope of [§ 1442(a)(1)] does *not* include simply *complying* with [federal] law." 551 U.S. at 152.

Plaintiff submits that the *Lind* contract "demonstrates what true [federal government] oversight looks like: direct contractual privity, mandatory compliance with federal standards, robust inspection and reporting, and strong enforcement remedies." Dkt. No. 20 at 7. For their part, Defendants cite *Lind* for the proposition that CoreCivic was "subject to detailed regulation through the FPBDS and regular monitoring and supervision by the USMS and other federal agencies (e.g., ICE) whose detainees are housed at CCCC pursuant to the IGA." Dkt. No. 16 at 12. The Court agrees with Plaintiff that the contractual relationship between the USMS and CoreCivic in *Lind* is more in line with the "special relationship" contemplated in *Watson* and *Suncor Energy*. Conversely, the Court is *not* convinced that the USMS IGA's imposition of a duty to adhere to

federal detention standards on the County, albeit as a pass-through entity for detention services ultimately contracted to CoreCivic, means that CoreCivic was "acting under" the USMS for purposes of § 1442(a)(1).

Notably, the OIG appears to agree with the general notion that a pass-through IGA for housing federal detainees significantly *reduces* a federal agency's oversight as compared to a direct governmental contract to do the same. *See* Dkt. No. 20, Ex. 7 at 5. Discussing the drawbacks of pass-through IGAs, the OIG explained that, under such agreements, state or local governments – not the federal government – manage the day-to-day conditions of confinement, and the USMS lacks the authority to implement policies at a given facility or to impose consequences if its requests or recommendations are not implemented. *Id*. Relatedly, the OIG emphasized that an IGA pass-through arrangement lacks "specific contractual penalties for noncompliance," with "[t]he only remedy for noncompliance [being] for the USMS to reduce or cease its use of the [facility]." *Id*. at 5.

In addition to a reduction in contractual oversight and enforcement, Plaintiff contends that meaningful federal oversight is absent *in practice* when USMS detainees are housed pursuant to pass-through IGAs like Plaintiff was here. Indeed, Plaintiff submits that even if the Court were to find that the limited federal oversight provided for in the USMS IGA implicates § 1442(a)(1), "in actual practice, the levels of direction baked into th[e] 'pass-through' IGAs are *not enforced by the USMS*." Dkt. No. 20 at 10 (emphasis added). In support, Plaintiff points to a July 2024 report published for Congress by the GAO. *See id*. In that report, the GAO observed that USMS policy requires only a "detention facility review" of private facilities operating under a pass-through IGA (and state and local facilities), whereas it requires a *more comprehensive* "quality assurance

review" of private facilities for which it has a direct contract for detainee housing.[11] *See* Dkt. No. 20, Ex. 8 at 8 n. 23, 11. The GAO noted that quality assurance reviews are typically performed by companies with subject matter expertise, while detention facility reviews are conducted by a deputy marshal as a "collateral duty." *Id*. at 17. The GAO further opined that detention facility reviews omit "key elements," observing that, in practice, the USMS has failed to provide adequate training or guidance for deputies conducting detention facility reviews. *Id*. Finally, the GAO noted that "[a]lthough [USMS] has procedures in place to help ensure private facilities address deficiencies during quality assurance reviews, [it] does not have similar procedures in place" for facilities subject to detention facility reviews. *See* Dkt. No. 20, Ex. 8 at 31. In other words, even the federal government has concerns about the degree and quality of oversight its agencies are exercising over private facilities operating in the context of pass-through IGAs.

And not only did the USMS and DOJ forfeit considerable *contractual* oversight and enforcement mechanisms by relying on a pass-through IGA arrangement to house USMS detainees at CCCC, Plaintiff insists that in bypassing the competitive bidding process typical of federal government contracting, these federal agencies also bypassed the process and the negotiations under which they exert authority and control over a private entity assisting in the performance of government tasks. Plaintiff's point is well-taken. Here, instead of contracting directly with CoreCivic following a competitive bidding process, the USMS essentially made use of detention services that CoreCivic was already providing to the County under pre-existing contracts with the expectation that those services would also adhere to federal detention standards.

---

[11] Although Defendants observe that the FPBDS standards, which the County and USMS referenced in the USMS IGA, were developed in part to "aid subject matter experts in administering the federal government's quality assurance program through audits of non-federal detention facilities" (Dkt. No. 16 at 11), Defendants do not submit any evidence to demonstrate that the CCCC was in fact subject to quality assurance reviews at any time relevant to Plaintiff's claims. The GAO report supplied by Plaintiff suggests otherwise. *See* Dkt. No. 20, Ex. 8.

Ultimately, the Court concludes that the constellation of contracts that make up the pass-through IGA arrangement here amount at most to agreements to assist in the performance of a governmental task (*i.e.*, housing and caring for federal detainees) but without the strict governmental oversight and supervision necessary to bring CoreCivic within the purview of § 1442(a)(1). After all, the Tenth Circuit has emphasized that the relationship between a private entity and a federal agency must be marked by "close supervision of the private entity" to satisfy § 1442(a)(1). *See Suncor Energy*, 25 F.4th at 1253 (citation omitted). The Court further concludes that Defendants' reliance on *Lind* is wide of the mark and that Defendants have failed to otherwise point the Court to any authority that would support extending § 1442(a)(1)'s forum protections to a private entity in CoreCivic's position here.

In short, by failing to establish that CoreCivic was "acting under" the USMS when it housed federal detainees at CCCC at the time of the incident giving rise to Plaintiff's claims, Defendants have failed to satisfy their burden to demonstrate federal subject matter jurisdiction. Accordingly, remand is warranted.

## IV.   CONCLUSION

**IT IS ORDERED** that Plaintiff's Motion to Remand (Dkt. No. 13) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **REMANDED** to the Thirteenth Judicial District Court, Cibola County, New Mexico for lack of subject matter jurisdiction.

**SO ORDERED.**

**THE HONORABLE GREGORY J. FOURATT**
**UNITED STATES MAGISTRATE JUDGE**
*Presiding by Consent*

24